UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


SHEILA RENEE RUNKLE, Administratrix
of the Estate of Robert Earl Runkle, Deceased                                    PLAINTIFF


v.                                                      CIVIL ACTION NO. 3:08-CV-00188


BECKY W. PANCAKE, *et al.*                                            DEFENDANTS


<u>**MEMORANDUM OPINION**</u>


Defendant Frederick W. Kemen, M.D., has moved for partial summary judgment (DN 143).

Plaintiff Sheila Renee Runkle, Administratrix of the Estate of Robert Earl Runkle, Deceased, has

filed a response (DN 150), and Defendant has filed a reply (DN 154). Thereafter, Plaintiff filed a

motion to strike (DN 156), to which Defendant responded (DN 157) and Plaintiff replied (DN 158).

Accordingly, both the motion for partial summary judgment and the motion to strike are ripe for

decision.


**BACKGROUND**

This action concerns the medical care Robert Earl Runkle received while in state prison.[1]

In 2003, while in state custody at the Western Kentucky Correctional Complex ("WKCC"),

Runkle was diagnosed with colon cancer. Runkle was transferred to the Kentucky State

Reformatory ("KSR") so that he could undergo chemotherapy treatments at a cancer center in

Louisville. After he completed those treatments, Runkle was transferred back to WKCC. In early

---

[1] Mr. Runkle, who filed the initial complaint in this case, passed away during the pendency of this suit. His wife, Sheila Renee Runkle, as administratix of his estate, has been substituted as the proper plaintiff-party to the action. For simplicity, the court will refer in this opinion to Mr. Runkle as "Runkle" and to Sheila Runkle as "Plaintiff."

2006, Runkle, believing the medical care at WKCC to be insufficient, sought a transfer back to KSR. Instead, he was sent to the Little Sandy Correctional Complex ("LSCC"). On May 10, 2006, Runkle saw prison doctor Ronald Fleming, whose assessment was that Runkle needed a follow-up colonoscopy and a carcinoembryonic antigen test, which would assess how widespread colon cancer was in Runkle as well as whether his treatment had been effective. Those tests were not immediately performed, however. After Runkle reported pain in his lower stomach and rectal area and blood in his stool in early September 2006, Dr. Fleming ordered a colonoscopy.

On October 10, 2006, a gastroenterologist performed a colonoscopy on Runkle at St. Claire Medical Center in Morehead, Kentucky. The gastroenterologist noted in a report that there was a "friable, irregular, firm" mass in Runkle's sigmoid colon. The gastroenterologist stated that if the biopsies of the mass showed no malignancy, he recommended repeating the colonoscopy "as soon as possible," because he was "highly suspicious of a recurrence of [a] tumor." The biopsy report showed that the mass was a tubular adenoma, a type of benign tumor.

On October 16, 2006, Dr. Fleming signed a form recommending an urgent transfer to KSR. The medical record noted that a tubular adenoma had been found in Runkle's sigmoid colon, which the doctor that performed the colonoscopy described as "angry, red and friable." Dr. Fleming also noted, apparently wrongly, that the gastroenterologist recommended surgical removal of the mass. On October 17, 2006, the Medical Director for the Department of Corrections approved the transfer to KSR.

The next day, October 18, 2006, Runkle arrived at KSR. Amy Johnson, a Licensed Practical Nurse, filled in a transfer screening form, which noted that Runkle's "Complete Chart"

- 2 -

was available. Although Dr. Kemen was in charge of the medical dorm where Runkle was initially placed at KSR, Advanced Registered Nurse Practicioner Roy Washington was the first to review Runkle's case. Nurse Washington requested a surgical consultation for Runkle concerning his colon mass. The request stated that Runkle had an abnormal colonoscopy, that he had previously had colon cancer, and that the pathology report from the abnormal colonoscopy indicated he had a tubular adenoma.

On October 19, 2006, the day after Runkle arrived at KSR, he was seen by Nurse Practicioner Michael Haun, who worked with Dr. Kemen. It was typical for Nurse Haun and Dr. Kemen to discuss the initial examinations performed by Nurse Haun. Nurse Haun's notes from the initial examination of Runkle contained a short review of Runkle's medical history, including that he had a history of cancer of the sigmoid colon, had developed blood in his stool and sharp pains in July 2006, and had an abnormal colonoscopy with a diagnosis of a tubular adenoma. Nurse Haun's assessment and plan stated that the medical staff needed to obtain Runkle's medical records from his colonoscopy at St. Claire Medical Center. Dr. Kemen explained that it was common for inmates who had procedures done at an outside hospital to not have the records from those procedures, and the medical staff at the prison would need to get those records and review them. On October 24, 2006, a Licensed Practical Nurse at KSR signed a form authorizing the release of Runkle's records from St. Claire to KSR.

On November 3, 2006, Dr. Kemen reviewed Runkle's records that had been received from St. Claire, including the report from the gastroenterologist stating that if the biopsy of the mass in Runkle's colon was benign, he recommended a repeat colonoscopy as soon as possible. Dr. Kemen requested that Runkle be scheduled for a sigmoidoscopy with multiple biopsies and

also be given Prilosec. In his notes, Dr. Kemen stated that the requested sigmoidoscopy was due to the fact that "cancer is extremely likely."

The request for a repeat sigmoidoscopy with multiple biopsies was sent to CorrectCare, which was Dr. Kemen's employer and which managed the health care for inmates at KSR. The utilization management department at CorrectCare was charged with approving or denying referrals to medical care outside KSR. Once CorrectCare approved a referral, the KSR staff was charged with scheduling the appointment. In addition to Dr. Kemen's request for a sigmoidoscopy, Nurse Washington's earlier request for a surgical consultation had also been provided to CorrectCare. The two requests were sent to a Therapeutic Level of Care Committee ("Committee"), which consisted of physicians, including Dr. Kemen, and nurse practitioners from four state institutions near La Grange, Kentucky. The Committee came to a consensus that regardless of the outcome of the sigmoidoscopy, the colon mass should be removed, rendering the sigmoidoscopy superfluous. On November 9, 2006, the Committee approved Nurse Washington's request for a surgery consultation with Dr. Hart for removal of the colon mass.

Meanwhile, on November 7, 2006, two days before CorrectCare approved Runkle for a surgery consultation, Dr. Kemen signed orders to discharge Runkle to the general prison population. Dr. Kemen has explained that he determined that Runkle was stable and was not in need of constant care while awaiting further medical procedures. As a result of Runkle being discharged to the general prison population, Dr. Kemen, who was responsible for the inmates in the medical dorms, was no longer the primary care provider for Runkle. Instead, Nurse Washington was assigned to be Runkle's primary care provider. During the month following his discharge to the general prison population, Runkle informed the medical staff at KSR four times

that he needed his medications renewed: first on November 11, again on November 20, and then a third and fourth time on December 1 and 2, respectively.

Meanwhile, on November 20, 2006, Runkle met with Dr. Hart, who ordered a CT scan. Dr. Hart also noted that he needed to get Runkle's colonoscopy report. Dr. Hart would see Runkle again after the CT scan. The next day, Nurse Washington, pursuant to Dr. Hart's instruction, requested the CT scan. Thereafter, a nurse from CorrectCare called Dr. Kemen to discuss the CT scan, and Dr. Kemen spoke to her and agreed the CT scan was necessary. CorrectCare approved the CT scan on December 5. On the approval form, CorrectCare listed Dr. Kemen as the primary care provider.

The CT scan was performed at Baptist Hospital Northeast on December 27, 2006. That same day, Runkle complained to a nurse of stomach pains and blood and mucus in his stool. The next day, Advanced Registered Nurse Practitioner Pauline Kuhbander saw Runkle concerning his complaints about pain and blood in his stool. Later that day, Kuhbander filled out a request for a consultation for Runkle. The request noted that the CT scan indicated "recurr[e]nc[e] and metastasis [of] colon cancer," and requested that Runkle see a gastroenterologist, surgeon, and/or an oncologist. On January 2, 2007, CorrectCare approved the request for an oncology consultation. On January 16, 2007, Runkle again sought care for stomach pain and stools with mucus and blood. On that date, Kuhbander requested a consultation with a gastroenterologist. Then, on January 30, 2007, Runkle filled out a request to see medical staff, in which he noted that he had colon cancer, that he had been having problems and pain since July, and that Kuhbander had told him two weeks before that he had been approved to see an oncologist, but that he had not yet been seen by a doctor for treatment.

- 5 -

On February 4, 2007, a Licensed Practical Nurse filled out a chart entry stating Runkle wanted an appointment with an oncologist and she was referring him to his care provider for review. The next day, Nurse Washington filled out a request for an oncology consultation. As the reason for consultation, Washington wrote, "Evaluate and treat; send Dec 2006 CT films." Three days after that, on February 8, CorrectCare approved the request for an oncologist consultation. Around that time, Runkle wrote a letter to the KSR warden concerning his medical needs. In a letter dated February 9, Martina Barnard, the Regional Director of Nursing for the Kentucky Department of Corrections responded to that letter, informing Runkle that he had an appointment with Dr. Hart "in the very near future" and that she understood that he had been approved for surgery. She stated that she would check on his case herself to ensure that he was taken care of in a timely manner.

On February 12, 2007, Runkle saw Dr. Hart, who scheduled the surgery for February 26. Dr. Hart performed the surgery as scheduled at Baptist Hospital Northeast. Dr. Hart resected two portions of Runkle's small bowel and diagnosed him with metastatic rectal carcinoma.

Runkle was discharged from Baptist Hospital Northeast to KSR on March 3, 2007. On that date, KSR medical staff requested a consultation "as soon as possible" at the J. Graham Brown Cancer Center ("JGBCC") for chemotherapy treatment. On March 6, 2007, Dr. Kemen wrote a letter to the KSR Warden suggesting that Runkle be considered for early medical parole because his "life expectancy [wa]s no more than 8 months." In the letter, Dr. Kemen noted that Runkle's surgery had revealed that he had "numerous matastases of cancer to the mesentery and peritoneum."

Runkle underwent chemotherapy treatments at JGBCC under the supervision of Dr. Vivek R. Sharma. The chemotherapy treatments involved infusions of Avastin and Oxiplatin at JGBCC, followed by a seven-day course of an oral adjuvant drug, Xeloda, to be given to Runkle at KSR. According to Dr. Kemen, his role in the chemotherapy treatments was to insure that Runkle received the Xeloda.

On September 18, 2007, Runkle did not receive a scheduled chemotherapy treatment at JGBCC because of a possible aneurysm. At that time, his Xeloda treatments were cancelled and a CT angiogram was requested. On October 2, 2007, after the CT angiogram revealed no aneurysms, Runkle restarted his chemotherapy treatments. According to Runkle's chemotherapy treatment itinerary, after October 2, he was scheduled for two treatments: one on October 16 and one on November 26.

However, on October 16, 2007, Runkle did not receive his chemotherapy treatment at JGBCC because he was admitted to University of Louisville Hospital after complaining of severe abdominal pain. Two days later, Runkle was discharged from the hospital and readmitted to the medical dorms at KSR under Dr. Kemen's care. The following day, Dr. Kemen signed an order that Runkle's Xeloda treatment be discontinued. Dr. Kemen explains in an affidavit that the reason he ordered Runkle's Xeloda treatment to be discontinued is that he had not received his chemotherapy treatment at JGBCC on October 16, 2007. The same day that Dr. Kemen ordered the Xeloda treatment be discontinued, Dr. Kemen also discharged Runkle from the medical dorm to the general prison population. Dr. Kemen states in his affidavit that it was Runkle's request that he be placed in the general prison population. Dr. Kemen noted in the discharge order that Runkle had a follow-up appointment scheduled for November 1, 2007 with

- 7 -

Dr. Lawrence Duvall, who, according to Dr. Kemen, became Runkle's primary care provider once he was in the general prison population.

On November 30, 2007, Runkle was discharged from prison on medical parole. It appears that he did not receive any chemotherapy treatments from the date of his last one on October 2 until his release from prison. Dr. Kemen disavows having had anything to do with any decision to discontinue Runkle's chemotherapy treatments.

## ANALYSIS

### 1. Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when there is sufficient evidence on which the jury could reasonably find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). The disputed issue does not need to be resolved conclusively in favor of the non-moving party, but that party must present sufficient probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968). The evidence must be construed in the light most favorable to the non-moving party. *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

Dr. Kemen seeks summary judgment on Plaintiff's federal claim, pursuant to 42 U.S.C. § 1983, that Dr. Kemen violated Runkle's Eighth Amendment right to be free from cruel and unusual punishment. "[D]eliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The deliberate indifference

standard has both an objective and a subjective component. First, the prisoner must have had a "sufficiently serious" medical need. *Perez v. Oakland County*, 466 F.3d 416, 423-424  (6th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004). The subjective component requires proof that a prison official had "a sufficiently culpable state of mind in denying medical care." *Id.* at 895 (quoting *Farmer*, 511 U.S. at 834). The plaintiff must produce evidence that a prison official knew of and disregarded an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837. "Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005) (quoting *Farmer*, 511 U.S. at 835).

Here, Dr. Kemen is entitled to summary judgment because the evidence, viewed in the light most favorable to Plaintiff, is insufficient for a reasonable jury to conclude that Dr. Kemen was deliberately indifferent to Runkle's serious medical needs. At the outset, there is no real dispute that Runkle had a sufficiently serious medical need. Indeed, in a review and affirmance of this court's grant of summary judgment to a different defendant in this case, Dr. Fleming, the Sixth Circuit explicitly held that the potential of recurrence of colon cancer for Runkle presented a sufficiently serious medical need. *Runkle v. Fleming*, 435 F. App'x 483, 484 (6th Cir. 2011). Thus, this court turns to whether Dr. Kemen was deliberately indifferent to Runkle's need for medical care.

First, as the recitation of facts shows, there is no doubt that Runkle received some treatment, including ultimately  surgery and chemotherapy, for his colon cancer. Plaintiff's contentions that Runkle was denied his Eighth Amendment right to be free from cruel and unusual punishment thus are not premised on a complete lack of treatment, but rather focus on the adequacy of Dr. Kemen's provision of medical services. Of course, as the Sixth Circuit has noted, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Nevertheless, because there are instances in which the medical attention rendered can be "so woefully inadequate as to amount to no treatment at all," *id.*, the court turns to a consideration of Plaintiff's specific arguments concerning the medical attention Dr. Kemen provided to Runkle.

Plaintiff puts forth two main arguments as to why she believes that Dr. Kemen acted with deliberate indifference toward Runkle. First, Plaintiff argues that Dr. Kemen caused delays in Runkle's surgery. Second, Plaintiff contends that Dr. Kemen exhibited deliberate indifference by terminating Runkle's chemotherapy.

The court begins with the first of Plaintiff's arguments: that Dr. Kemen caused a delay in his surgery, and, by doing so, was deliberately indifferent to Runkle's serious medical needs. Plaintiff argues that there were three periods of delay of surgery that Dr. Kemen was responsible for: 1) from October 18, 2006, the date of Runkle's arrival at KSR, until November 3, 2006; 2) from November 3 until November 9, 2006; and 3) from November 7, 2006 until February 26, 2007, when Runkle had surgery. Those periods will be dealt with in turn.

The first period of delay in his surgery that Plaintiff attributes to Dr. Kemen ran from Runkle's arrival at KSR on October 18 until November 3, 2006, which was the date that Dr. Kemen requested a sigmoidoscopy with multiple biopsies after having reviewed Runkle's medical records from St. Claire Medical Center. Plaintiff argues that the evidence is sufficient to show that Runkle's medical records, including the records from St. Claire Medical Center, accompanied Runkle when he was transferred to KSR. In support of that, Plaintiff points to three pieces of evidence: 1) the fact that Dr. Fleming had a copy of the St. Claire Medical Center records at LSCC; 2) a statement on the Department of Corrections Medical Movement Form that "Medical Records and Medications Shall Accompany the Inmate"; and 3) an indication by Nurse Amy Johnson at KSR that Runkle's "Complete Chart" was available. Plaintiff contends that because Dr. Kemen had a copy of the St. Claire medical records at the time Runkle arrived at KSR, his decision to wait until November 3 to review those medical records constituted deliberate indifference.

However, contrary to Plaintiff's argument that Dr. Kemen had the St. Claire medical records on October 18 but chose not to look at them until November 3, no reasonable jury could conclude that Dr. Kemen was being deliberately indifferent to Runkle's serious medical needs at that time. Despite Plaintiff's speculation from the form statement that Runkle's medical records should accompany him and the notation by Nurse Johnson that his "Complete Chart" was available, it is apparent that KSR did not yet have the St. Claire medical records. After all, just one day after Runkle arrived at KSR, Nurse Haun noted the need to obtain those records, and five days after that, a nurse at KSR signed the authorization form to order Runkle's records from St. Claire. Simply put, the evidence is insufficient for a reasonable jury to conclude that during

the two-week period when KSR medical staff was actively taking steps to obtain Runkle's medical records to treat Runkle, Dr. Kemen was simultaneously being deliberately indifferent to Runkle's needs. Furthering the court's conclusion in this regard is the fact that, when KSR received the records, Dr. Kemen promptly reviewed them and requested a consult for a sigmoidoscopy and multiple biopsies, which was consistent with what the gastroenterologist at St. Claire recommended. That Dr. Kemen promptly acted upon the St. Claire medical records that KSR had actively sought shows that Dr. Kemen was not simply ignoring Plaintiff's medical needs during the first time period identified by Plaintiff.

Plaintiff also suggests that, even if KSR did not have his medical records from St. Claire prior to November 3, Dr. Kemen could have obtained those records in a more expedient manner, and his failure to do so constituted deliberate indifference. In particular, Plaintiff suggests that Dr. Kemen should have requested that St. Claire send the medical records by fax rather than by mail. However, even assuming that Dr. Kemen was personally responsible for the manner in which the St. Claire Medical records were sent to KSR–a fact that he disputes–his failure to request that the records be provided more quickly than they were does not constitute sufficient evidence to conclude that he was deliberately indifferent to Runkle's medical needs. Because it is obvious that he was taking steps to address Runkle's needs by obtaining the necessary medical records, it is hard to see how he could also have been acting indifferently to Runkle's needs at the same time. In short, Runkle's argument as to the reasonableness of the manner in which KSR requested his medical records is better directed to a negligence claim than to a claim that Dr. Kemen violated the Constitution.

Plaintiff further argues that, even without the St. Claire medical records, a review of Runkle's other medical records, which were at KSR, would have established enough facts for Dr. Kemen to know that he was in need of urgent treatment. Plaintiff points out that the KSR staff was aware that Runkle had a history of colon cancer, had developed blood in his stool and abdominal pains in July of 2006, had an abnormal colonoscopy, and was transferred to KSR shortly after the colonoscopy. However, even though there were indications in Runkle's medical records that accompanied him to KSR which would show that he was in need of medical care and follow-up, the fact that Dr. Kemen desired to read the actual report from the colonoscopy prior to making a determination as to the course of action to be undertaken is insufficient to conclude that he was deliberately indifferent to Runkle's medical needs. Simply put, the court cannot determine that the medical attention Runkle received from October 18 to November 3 was "so woefully inadequate as to amount to no treatment at all." *Westlake*, 537 F.2d at 860 n.5. Instead, Plaintiff has shown nothing more than a dispute about the adequacy of the treatment Dr. Kemen and the KSR staff dispensed during that time period, and that is not enough to state a claim under the Eighth Amendment. *Id.; Thomas v. Coble*, 55 F. App'x 748, 749 (6th Cir. 2003) (summary judgment appropriate on deliberate indifference to medical needs claim where inmate "received medical attention and merely disputes the adequacy of the treatment").

The next time period at issue is from November 3 until November 9, 2006. Plaintiff argues that Dr. Kemen caused a delay during that time period by requesting a consultation for a sigmoidoscopy with multiple biopsies on November 3, even though Nurse Washington had previously requested a surgical consultation on October 18, the first day Runkle was at KSR. Accordingly, CorrectCare referred the decision as to the correct course of action–surgery or

sigmoidoscopy–to the Committee, which ultimately approved Nurse Washington's request for a surgical consultation on November 9. Plaintiff, pointing out that Dr. Kemen noted that "cancer [wa]s extremely likely" on his sigmoidoscopy consult request, argues that Dr. Kemen should instead have simply requested a surgical consultation on November 3.

However, once again, Plaintiff's contentions are more suited to a medical malpractice claim than a constitutional deliberate indifference claim. The court notes that the St. Claire biopsy had indicated a tubular adenoma, not cancer, and the gastroenterologist at St. Claire had recommended that in such a case Runkle receive a repeat colonoscopy. Dr. Kemen's request for a sigmoidoscopy with multiple biopsies was thus consistent with the recommendation of the gastroenterologist.[2] Further, Dr. Kemen's chart entry requesting the sigmoidoscopy requested that it occur "ASAP." And, the delay Plaintiff argues was caused by Dr. Kemen's request for a sigmoidoscopy consultation was a mere six days, hardly the length of time that would serve to show that the medical staff that was not intent on attending to Runkle's needs. In short, the evidence shows that when Dr. Kemen requested the sigmoidoscopy, he was doing so because he made a medical judgment–whether reasonable or not–about what would be the appropriate next step in Runkle's treatment, not because he was deliberately indifferent to Runkle's medical needs. While Plaintiff may disagree with Dr. Kemen's medical judgment, this court does not sit to second-guess that judgment. *Westlake*, 537 F.2d at 860 n.5; *Thomas v. Coble*, 55 F. App'x at 749; *see Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (noting that "a plaintiff

---

[2] Plaintiff points out that the recommendation of the gastroenterologist was actually that Runkle receive a colonoscopy, not a sigmoidoscopy. Plaintiff states that, unlike a colonoscopy, "a sigmoidoscopy is usually conducted in a doctor's office without anaesthesia and takes only 20-30 minutes." However, as Dr. Kemen points out, the difference is of little concern here where the mass at issue was located on Runkle's sigmoid colon, and a biopsy of that area could be obtained via a sigmoidoscopy.

alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment" so as "to prevent the constitutionalization of medical malpractice claims").

Having concluded that there is no indication in the evidence that the first two periods of time identified by Plaintinff–which lasted for a total of less than one month and were marked by activity of the KSR medical staff in obtaining Runkle's records and deciding on the most appropriate next step in his treatment–constituted delay due to deliberate indifference on the part of Dr. Kemen, the court turns to the third period of time identified by Plaintiff: from November 7, 2006 until Runkle's surgery on February 26, 2007. On November 7, Dr. Kemen, having requested the sigmoidoscopy, discharged Runkle from the medical dorm to the general prison population. Dr. Kemen explains that he did so because Runkle "was stable and did not require constant medical attention" while awaiting his future procedure. Dr. Kemen further explains that when Runkle was discharged to the prison population, Dr. Kemen was no longer his primary care provider; instead, Nurse Washington became his primary care provider. Thus, Dr. Kemen submits that he was not responsible for Runkle's care during the third period.

Plaintiff, while not disputing that Dr. Kemen was not the primary care provider during the third period of time, instead faults Dr. Kemen for the decision to discharge Runkle to the general population. In Plaintiff's view, Dr. Kemen's decision, which ended Dr. Kemen's responsibility as Runkle's primary care physician, was an attempt by the doctor to "abandon his responsibilities" in reckless disregard for Runkle's needs. Plaintiff further contends that Dr. Kemen's decision was in violation of a Kentucky Department of Corrections regulation, Policy No. 13.2. Specifically, Plaintiff points to the portion of that regulation defining "primary care provider" as "the institutional medical doctor, nurse practicioner or physician assistant who

- 15 -

evaluates the inmate's total health needs; provides personal medical care; and, if medically needed, preserves continuity of care and coordinates other providers of health services."

Initially, the court notes that whether or not Dr. Kemen violated a Department of Corrections regulation is not determinative of whether or not he violated the Constitution. In other words, the Eighth Amendment does not require that prison officials follow their own rules and regulations. It only requires that the officials are not deliberately indifferent to a prisoner's needs. Thus, to the extent that Plaintiff seeks to hold Dr. Kemen responsible for every event between the date of Runkle's discharge and the date of Runkle's surgery simply because Plaintiff believes Dr. Kemen violated a prison regulation, the court rejects that argument.

However, it is also true that if Dr. Kemen decided to discharge Runkle with the knowledge that doing so would result in Runkle receiving inadequate health care, Runkle could have a constitutional claim against Dr. Kemen. And, it would be relevant to the determination of Dr. Kemen's state of mind with regards to his decision to discharge Runkle whether Dr. Kemen's decision to do so violated a prison regulation. However, even as the court acknowledges the potential relevance of the prison regulation, the court disagrees with Plaintiff that Dr. Kemen violated Policy No. 13.2. Nothing about that regulation limits the Department of Corrections or the prison from assigning inmates new primary care providers at any given time. The regulation simply states that the primary care provider assigned to the inmate is responsible for ensuring that the inmate receives any necessary medical care.

In this case, Dr. Kemen believed that while Runkle awaited his future procedures, it was not necessary to keep him in the medical dorms; instead, Runkle could be in the general prison population. And, at KSR, an inmate's primary care provider is determined by which area of KSR

- 16 -

the inmate resided in: Dr. Kemen was responsible for those inmates in the hospital and posthospital medical dorms; Dr. Khyat was responsible for the inmates in the nursing care facility; and Dr. Khyat, Dr. White, and various Nurse Practitioners were responsible for inmates in the general population. Thus, once Runkle was discharged from the medical dorms, Nurse Washington became his primary care provider, the person responsible for ensuring that Runkle's medical needs were attended to. In other words, Dr. Kemen did not "abandon" his responsibilities to Runkle, but instead made a judgment that Runkle was fit to live in the general prison population at that time, which in turn meant that Nurse Washington would be overseeing Runkle's medical care. While Plaintiff questions the wisdom of assigning a different primary care provider to an inmate who is discharged to the general prison population as he awaits future medical procedures, that is not a question for this court to consider. Rather, the sole question under the Eighth Amendment is whether Dr. Kemen was deliberately indifferent to Runkle's medical needs when he discharged Runkle.

Here, the evidence is insufficient to find that Dr. Kemen's decision to discharge Runkle to the general population was done with the requisite mental state to sustain a claim under the Eighth Amendment. First, as noted above, Dr. Kemen has put forth a valid reason for the discharge–that Runkle was stable and did not require constant medical attention while awaiting his next procedure. Further, the discharge did not result in Runkle being without a care provider; it simply meant that Runkle had a primary care provider other than Dr. Kemen. And not only did Runkle have a primary care provider, but that care provider was Nurse Washington, who was familiar with Runkle and was, in fact, the one that had initially requested a surgery consultation. Notably, Runkle continued to receive medical attention after his November 7 discharge. On

- 17 -

November 9, the Committee, which included Dr. Kemen, approved Nurse Washington's request for a surgery consultation. Eleven days after that, on November 20, Runkle met with Dr. Hart, the surgeon, who ordered a CT scan for Runkle. And the next day, Nurse Washington requested the CT scan, per Dr. Hart's orders. Simply put, that Runkle continued to receive medical attention for his serious medical needs after Dr. Kemen discharged him dispels the notion that Dr. Kemen discharged Runkle with deliberate indifference to Runkle's needs.

Plaintiff argues that Dr. Kemen also acted with reckless disregard for Runkle's medical needs by not notifying CorrectCare that he was no longer Runkle's primary care provider. Plaintiff points out that CorrectCare listed Dr. Kemen as Runkle's primary care provider on the December 5 Authorization Form that approved Runkle for a CT scan. While it thus appears that Plaintiff is correct that Dr. Kemen did not notify CorrectCare of the change in Runkle's primary care provider, it is hard to see how that failure constituted deliberate indifference to Runkle's medical needs. After all, Dr. Kemen stated during his deposition that a nurse at CorrectCare had contacted him and talked to him about whether Runkle needed the CT scan. Rather than deflecting the nurse's question on the basis that he was no longer Runkle's primary care provider, Dr. Kemen took the time to speak to the nurse and answer her questions, which, in turn, led to CorrectCare approving the CT scan. Thus, the court sees no way to interpret Dr. Kemen's failure to notify CorrectCare about the change in Runkle's primary care provider as being due to some sort of reckless disregard for Runkle's medical needs, much less that Dr. Kemen's failure to notify CorrectCare had any effect at all on Runkle's medical condition.

Finally, Plaintiff argues that the third time period at issue, from November 7, 2006 until February 26, 2007, was marked by repeated failures on the part of the KSR medical staff to

- 18 -

adequately address Runkle's medical condition. For instance, Plaintiff points out that the CT scan was performed on December 27, 2006, but, despite that Runkle repeatedly complained to the medical staff about pain and blood in his stool and went so far as to write a letter to the warden concerning his lack of medical care, Runkle did not meet with the surgeon, Dr. Hart, until February 12, 2007. Likewise, Plaintiff notes that for almost a month beginning around November 11, 2006, Runkle was without his stomach medications, despite asking for them to be refilled four times.

The court hesitates to speculate as to the cause of, and effect of, the delay between Runkle's CT scan and his next meeting with Dr. Hart, as well as the reasons that Runkle did not receive his stomach medications. It is enough, for the purposes of deciding the motion before the court, to state that the evidence is clear that during that time period, Dr. Kemen was not responsible for coordinating Runkle's medical care, and that, as explained above, Dr. Kemen's decision to discharge Runkle to the general prison population–thereby putting him under the care of Nurse Washington rather than Dr. Kemen–was not done with deliberate indifference to Runkle's medical needs. In light of those facts, and because Plaintiff must prove that Dr. Kemen himself acted with deliberate indifference before he may be held liable under the Eighth Amendment, there is no basis for imputing any improprieties on the part of other members of the KSR medical staff to Dr. Kemen during this time period.

The court has one final note on the subject of delay in Runkle's surgery. Plaintiff has submitted a report by Dr. Charles F. Winkler expressing his opinion that Runkle received "grossly inadequate care" while incarcerated by the Kentucky Department of Corrections because his surgery was "inappropriately delayed." Dr. Winkler's conclusion appears to be

premised in large part on delays Runkle suffered in obtaining examinations prior to his transfer to KSR. However, even assuming that Dr. Winkler's opinion related to the four-month period between Runkle's transfer to KSR and his surgery, the conclusion that Runkle received "grossly inadequate care" is insufficient to show that Dr. Kemen violated the Eighth Amendment.

First, "grossly inadequate care satisfies only the objective prong of the deliberate indifference standard." *Runkle v. Fleming*, 435 F. App'x at 485. Additionally, Dr. Winkler's report does not distinguish Dr. Kemen's actions from the actions of others for whom Dr. Kemen cannot be held constitutionally responsible. And for the time period that Dr. Kemen was Runkle's primary care provider, which was the relatively short period from October 18 until November 7, 2006, the record reflects that his care did not qualify as "grossly inadequate." To meet that "high threshold," "medical care must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* (quoting *Miller v. Calhoun County*, 408 F.3d 803, 819 (6th Cir. 2005)). During the time period when Dr. Kemen was responsible for Runkle's care, the KSR staff ordered Runkle's St. Claire medical records, which Dr. Kemen reviewed prior to requesting a sigmoidoscopy consultation. That request was consistent with the recommendation of the gastroenterologist at St. Claire who performed the colonoscopy. Finally, having requested that consultation, Dr. Kemen determined that Runkle was fit to be among the general prison population while he awaited the procedure, and thus decided to discharge Runkle from the medical dorms. Nothing about Dr. Kemen's actions during the time period prior to Runkle's surgery when Runkle was under Dr. Kemen's care "shock[s] the conscience."

Beyond the period of time leading up to Runkle's surgery, Plaintiff also complains that Dr. Kemen stopped Runkle's chemotherapy treatments. Plaintiff's argument is premised on the fact that on October 19, 2007, while Plaintiff was again in the care of Dr. Kemen, the doctor signed an order that Runkle's Xeloda treatment be discontinued, and that Runkle thereafter received no further chemotherapy treatments prior to his release from prison on November 30, 2007.

However, the evidence does not support Plaintiff's theory that Dr. Kemen improperly prevented Runkle from continuing his chemotherapy. First, the evidence in the record conclusively demonstrates that Dr. Vivek Sharma, an oncologist at JGBCC, planned and coordinated Runkle's chemotherapy treatments. The role of the staff at KSR was simply to insure that Runkle received the seven-day course of Xeloda after one of Runkle's infusion treatments at JGBCC. In light of that, there is not sufficient evidence for a reasonable jury to find that Dr. Kemen somehow stopped Runkle's chemotherapy treatments out of disregard for Runkle's medical needs.

Moreover, the record clearly demonstrates the reason Dr. Kemen ordered that Runkle's Xeloda treatment be discontinued on October 19: Runkle had not received his infusion treatment at JGBCC on October 16 because of abdominal pain. Notably, when Runkle previously did not receive his scheduled infusion treatment on September 18, 2007 due to a possible aneurysm, his Xeloda treatments were also withheld. Thus, there was clearly a valid medical reason for Dr. Kemen's October 19 order that Runkle's Xeloda treatment be discontinued, and there is no evidence that Dr. Kemen did so out of deliberate indifference to Runkle's health needs.

It does appear to be true that Runkle received no further chemotherapy treatments during the month and a half period between when Dr. Kemen ordered Runkle's Xeloda treatment to be discontinued and when Runkle was released from prison. But there is no evidence that the failure of Runkle to receive those treatments was due to Dr. Kemen's orders. Runkle's assertions to the contrary are based on mere speculation, which is insufficient to prove that Dr. Kemen was deliberately indifferent to Runkle's needs. In fact, Dr. Kemen discharged Runkle to the general prison population on October 19, which, Dr. Kemen states, was done at Runkle's request. And, because Runkle was discharged from the medical dorm, Dr. Kemen was no longer Runkle's primary care provider after October 19. Instead, Dr. Lawrence Duvall was Runkle's primary care provider from that date until Runkle was released from prison. Indeed, Dr. Kemen's order discharging Runkle to the general prison population explicitly noted that Runkle was to have a follow up appointment with Dr. Duvall on November 1, 2007.  Moreover, as explained above, Dr. Sharma at JGBCC, and not the KSR staff, was the medical professional in charge of Runkle's chemotherapy treatments.  Simply put, there is no basis for finding that Dr. Kemen was responsible for any decision to prematurely end Runkle's chemotherapy treatments.

## 2. Motion to Strike

Plaintiff has moved to strike two statements Dr. Kemen submitted with his reply papers. One statement was made by Dr. Kemen in an affidavit attached to his reply memorandum, and the other statement was in the reply memorandum itself. The statement in the affidavit that Plaintiff wishes to strike is paragraph 8, which states, "Requesting biopsies before surgery served a valid medical purpose. If the biopsies showed that the mass was a benign tubular adenoma, there was a possibility of removing Mr. Runkle's mass without invasive abdominal

surgery." The statement Plaintiff seeks to have struck from the reply memorandum draws upon the statement in the affidavit. That statement is as follows: "Dr. Kemen's request for biopsy of the mass prior to surgery is based upon sound medical reasoning: If it was confirmed against to be a benign tubular adenoma as before, there was a possibility of removing it without invasive abdominal surgery" (citing Kemen Affidavit, ¶ 8) (internal footnote omitted).

The basis for Plaintiff's motion to strike is that, according to Plaintiff, those statements are inconsistent with Dr. Kemen's deposition testimony, in which Dr. Kemen stated that the consensus of the Committee was that, regardless of what the sigmoidoscopy showed, Runkle should have surgery to remove the mass in his sigmoid colon. Thus, Dr. Kemen stated in his deposition, the Committee, of which he was a part, decided that the sigmoidoscopy was "not going to make a difference in what we're going to do. Regardless – regardless of how the procedure turned out, we would proceed with surgery to remove the mass." Plaintiff argues that the statement in Dr. Kemen's affidavit "directly contradicts" Dr. Kemen's prior sworn deposition testimony and is simply a retrospective self-serving attempt to justify his decision to request a sigmoidoscopy. Plaintiff also strangely argues that Dr. Kemen's contradictory statements were an attempt to create "a sham fact issue," despite that Dr. Kemen was the one moving for summary judgment. Alternatively, Plaintiff contends that Dr. Kemen's statements must be struck because they expressed an expert opinion, but he did not demonstrate that he is qualified to render an expert opinion, or else because the statement is hearsay.

Beginning with the Plaintiff's alternative arguments first, the court has no problem disposing of them. First, the court sees no basis to find that Dr. Kemen's statement is hearsay. The statement was simply Dr. Kemen's explanation of the reason underlying his decision to

recommend a certain medical procedure, not a statement made by a non-testifying declarant that is offered to prove the truth of the matter asserted in the statement. F. R. Evid. 801(c). Second, while Dr. Kemen may not have set forth his credentials in his affidavit to show that he is qualified to render an expert opinion, in this case he is the defendant accused of improperly treating Runkle and is thus entitled to explain the reasons for his own medical decisions.

Nor will the court grant Plaintiff's motion to strike based on her alternative argument that the statement in Dr. Kemen's affidavit directly contradicted his prior deposition testimony. Generally, "a party cannot create a disputed issue of material fact by filing an affidavit that contradicts the party's earlier deposition testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006). The purpose of such a rule is to "bar[] the nonmoving party from avoiding summary judgment by simply filing an affidavit that directly contradicts that party's previous testimony." *Id.* at 907. The rule does not, however, prohibit "a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit." *Id.* Thus, a "directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction," and an affidavit with no direct contradiction should be stricken only if the affidavit is an attempt to create a "sham fact" issue. *Id.*

Here, the court notes that there is some tension between Dr. Kemen's statement in his affidavit that a sigmoidoscopy could have proven medically useful and the later consensus by the Committee, which included Dr. Kemen, that surgery was the appropriate course of action no matter what the results of the sigmoidoscopy would be. Nevertheless, the court does not find that Dr. Kemen's affidavit and his deposition were "directly contradictory." Dr. Kemen's statement

in his affidavit related to his reasons for requesting a sigmoidoscopy, while his deposition testimony concerned the reasons for the Committee's decision, which was made after the request for a sigmoidoscopy had been submitted to it. It is possible that Dr. Kemen believed at the time he requested the sigmoidoscopy–and still believes today–that there was a valid medical reason for that request, but nonetheless decided to acquiesce in the Committee's decision that surgery was the best course of action under the circumstances.

Moreover, the main purpose underlying the rule that a "directly contradictory" affidavit must be struck would not be served by striking the statement in Dr. Kemen's affidavit. The whole point of the rule is to prevent a party from fighting summary judgment by submitting conflicting evidence from the same witness in an attempt to show a factual dispute. Here, Dr. Kemen is the one who moved for summary judgment, i.e., he is the one who is asserting that there is no genuine issue of material fact and that he is therefore entitled to judgment as a matter of law. It makes no sense that he would try to create a "sham fact" issue; it would serve no purpose for him.

Finally, even if this court were to strike the statement in Dr. Kemen's affidavit, it would still find that summary judgment on behalf of Dr. Kemen is appropriate. The question of whether the request for a sigmoidoscopy with a biopsy served a valid medical purpose may be relevant to a medical malpractice claim. But, as explained in more detail above, in assessing Plaintiff's constitutional claim concerning Dr. Kemen's provision of medical care to Runkle, the question is only whether Plaintiff can show that Dr. Kemen acted with deliberate indifference to Runkle's medical needs. Even without the benefit of Dr. Kemen's opinion that requesting a sigmoidoscopy with multiple biopsies served a valid medical purpose, there is no evidence that

Dr. Kemen's decision to make that consultation request was done with the requisite mental state. After all, Dr. Kemen was requesting the same medical procedure that the gastroenterologist at St. Claire who performed Runkle's colonoscopy had recommended, and he further requested that the sigmoidoscopy occur "ASAP."

### 3. Plaintiff's Remaining Claims

Dr. Kemen has only moved for summary judgment on Plaintiff's 42 U.S.C. § 1983 claim that Dr. Kemen violated Runkle's constitutional rights. In addition to that claim, Plaintiff has asserted pendent state claims against Dr. Kemen for violating Runkle's statutory right to necessary and reasonable medical care, outrage, negligence, medical negligence, and wrongful death. Having resolved Plaintiff's only federal claim against Dr. Kemen, the court believes it appropriate to dismiss the remaining pendent state claims against Dr. Kemen without prejudice. The resolution of those purely state issues falls more appropriately upon the state courts.

### CONCLUSION

Dr. Kemen's motion for partial summary judgment will be granted. Plaintiff's motion to strike will be denied. Plaintiff's claim, pursuant to 42 U.S.C. § 1983, that Dr. Kemen violated Runkle's constitutional rights will be dismissed with prejudice, and the remaining state law claims will be dismissed without prejudice.

August 24, 2012

Charles R. Simpson III, Judge
United States District Court

D03

- 26 -